I represent Richard Hart. On January 24, 2003, in Haines, Alaska, Richard Hart's vessel, the Phobos, sank during a winter storm of unique viciousness. There were 70-mile-an-hour winds, single-digit temperatures, and a two-foot chop in the harbor. Is there a dispute that no other boat sunk in the harbor? During that storm, no. There is no dispute. So this is the only one that sank? This is the only boat that sank. There was damage to other vessels in the harbor during the storm, but no other vessels sank. Okay, so it was not as vicious to take on a whole bunch of them. And in your client's situation, he had done a repair on the boat that left the ability for water to come in. He left a gap, and he hadn't secured it, and he left it for months there in that condition. I would disagree that that's what he did. Why don't you put it better than I did? Mr. Hart was an accomplished mechanic. He had employed as a mechanic repairing vessels before he owned a vessel, Phobos. He had installed the port engine previously. He was installing a new starboard engine on the vessel. There was a coupling. The exhaust was a wet exhaust. It ran eight foot horizontally. The stern of the vessel took approximately a 90 degree curve, ran 20 inches up, at which time it hooked into the starboard engine. There was a coupling that required a reducer valve, and he needed to have that reducer valve manufactured when he was in the process of repairing it. So it would have taken two weeks for him to get the reducer valve manufactured, and so he was planning on vacation. So he moved the vessel to a safe location. He tied it on the main dock, asked two people to watch the vessel for him. He had two custodians to watch the vessel. But on vacation, he was gone approximately a month, two weeks longer, than it would have taken for the reducer valve to be installed. You're telling a different story, but the thing that I— You know, you've got to deal with that. So, you know, he did a lot of other stuff. He tied up the bows, he taught people to look at it. He had a good rate on it. We understand all that, but in the end, he left the vessel there with a hole in it, basically, where water would go in. The vessel had a hole in it 365 days a year from the date the vessel was manufactured. It had a wet exhaust. The exhaust pipes came out of the stern of the vessel. It sat approximately four inches above the water line. It was the way the vessel was manufactured. It was the way other vessels—testimonies, some vessels have wet exhausts. The issue is— What happens if water gets into one of those wet exhausts? Mr. Hart, you don't know what happens in this particular case. No, no. What happens in the normal case? Well, the wet exhaust connects to the engine, right? So if water gets into there, it doesn't get into the boat. You've got a pipe, basically, going from the back of the boat. There's a big hole that's an exhaust, like an exhaust pipe, right? And that pipe goes all the way and connects at the other end to the engine. So if water gets in the pipe, it may get to the engine.  But the problem with the way Mr. Hart loved the boat is water could get in the pipe, and there was a hole at the other end of the pipe where water got in the pipe could get in the boat. Well, the water didn't come out of the hole in the other end of the pipe. Am I mistaken about what I described? When the— Am I mistaken about what I described? Yes, you are. Okay, tell me where. You're mistaken because you described that there was a hole in the boat in which water could come out of. The pipe runs horizontally, and the stern of the vessel rises 20 inches from the stern. In order for the water to come out of the pipe, the vessel's stern would have had to have gone down in the water in order to force the water out of the top of the pipe. When the vessel was salvaged, it wasn't the 90-degree rubber boot changing from the vertical. The horizontal was off. That was off. That's how the water entered the vessel. When the 90-degree rubber boot was removed, the testimony from the experts, progressives experts— But that's what was not completely connected to the engine, as it usually should have. Ordinarily would have been, right? It was completely connected, except there was some kind of a board or batten that connected it to keep it from—when the engine was running, to keep the thing from vibrating. Mr. Hart had not connected that because the engine wasn't running. That's what Judge Kuczynski is talking about, about the gap. The gap is, at that end, there was—in fact, that was what was unusual about the situation. No. At the end, where it came out of the boat, it wasn't unusual. It was in its usual condition, but it was unusual at the point at which it connected to the engine. That's what I understood. Is that correct? At the point that it connected to the engine, but the point that—the point where the water came into the vessel was not at the point where it connected to the engine. I understand that. Water came into the vessel when— But the question is whether water, which now came into the engine, was going to go someplace different than it would have gone ordinarily because of this gap at the part near the engine or the looseness of that connection. And I guess what would be helpful to me is for you to tell me what conflict in evidence there is on that question, given that the two expert—fairly short expert reports, where one of them says this is how it happened, and the other one doesn't say how it happened, but says that some of the things the first one says are and so. So where does that leave us? I think the evidence shows that the water did not come out of the pipe where it connected with the engine. The water came out of the pipe when the 90-degree boot came off. Because it disconnected. But the question is whether the gap where it connected to the engine had something to do with why it disconnected. The evidence, as shown by the progressive expert, said—first he came out and said that the rubber boot was only single clamped and that ice had forced it off, or alternatively, away to the water. And that's the basis on which progressive denied Mr. Hart's claim because they claimed there was inadequate maintenance. During litigation, this position changed. He admitted that the boot had been double clamped, ice was no longer a factor, and he claimed that there was water hammer, where the water would be forced in from the stern of the vessel through this pipe, hit the rubber boot such that it would hammer on the boot, forcing it off the horizontal pipe. Mr. Hart's expert had actually recreated using— and again, there was no methodology or scientific testing done by progressive experts. This was his bare opinion. Mr. Hart's expert actually recreated the exhaust system in his laboratory, attempted to determine whether or not water could freeze and force the boot off, determined that that was not correct. Based upon the industrial strength of the parts and rigidity of the parts as he understood it, he actually did a mechanical and mathematical analysis to say that this water hammer theory is not correct. One is that you don't have a water hammer, requires a valve or a termination point at which the water would hit against it. In this case, there was no termination point. The water would simply go up the pipe and back down the pipe again. There was insufficient force generated by the waves, the two-foot waves. He estimated they were 16 feet long. Mr. Clark, I think we understand what each expert says. The question, and I think Judge Brisson has the same concern I do, but I'll tell you what mine is, and that is, is that enough? In other words, from a shifting of the burdens of proof perspective, is it enough to successfully overcome a summary judgment motion for your expert to simply say, I don't think that the other side's expert is correct, but I can't tell you why this vessel sank. Is that enough to get you past summary judgment? Absolutely. Mr. Hart's insurance policy said you'll pay unless an exclusion applies. The law is that if an exclusion is pled, then that puts a burden on you. But everybody agrees that the pipes separated. Apparently, your expert can't explain why, but he thinks that the insurance expert's reasons are wrong. But water clearly came in through the separated pipe, and that's what flooded the vessel. That is correct. And if the exclusion is for inadequate maintenance, my question to you is, doesn't the insured have to come up with more evidence in order to overcome the insurer's invocation of the policy exclusion in the face of this evidence? Well, I think the insurer, in this case, invoked the policy exclusion and said, this is why the exclusion applies. One, it's because there were not muffler guards in the back of the vessel. The vessel was designed, built, and insured without muffler guards. And two, it's because the water coming in drove this, because it didn't have muffler guards and it was sitting in a harbor, the water came in and drove this off. But it didn't make a difference with regard to the port engine, did it? Because the integrity of the port engine's exhaust system was not compromised, even though it suffered the same lack of flapper valve protection that you're talking about. There could be any number of reasons why that happened or why it didn't happen. But the difference is that your client had been working on the starboard engine and had left the vessel in an incompleted repair state prior to the storm. And so I'm still struggling with doesn't Mr. Hart have to come up with something more to overcome the insurer's policy exclusion for inadequate maintenance? Under the burden of proof, Mr. Hart can simply show to the jury, to the court, that the insurer's basis for making this decision is incorrect. And therefore, since they carry the burden, they carry the burden to prove that the inadequate maintenance exclusion applies, then their basis for making that decision was incorrect. How is that different from our case law that says in overcoming a summary judgment motion, the non-moving party must do more than simply disavow or disclaim the evidence of the other side. It must affirmatively set forth proof to create a material issue of fact and dispute that the jury has to resolve. Mr. Hart did set out affirmatively material issues of fact. But his expert can't say why the vessel sank. His expert didn't say why the vessel sank. He didn't. He was not. He says, I can't. I can't say. Right. I don't know. But I'm pretty sure that the other guy's theories are wrong. He said the other guy's theories are wrong. That's correct. And you think that's enough. I think that's more than adequate in a summary judgment context to defeat a summary judgment motion. Thank you. May it please the Court. My name is Pamela Weiss, and I'm here on behalf of Progressive Casualty Insurance Company. As it was stated very well by Judge Kaczynski earlier, Mr. Hart knowingly left his boat in the water with an open hole to the ocean and unsupported exhaust. The open hole to the ocean is how the boat was designed, right? Correct. And the lack of mufflers is also how the boat was designed. According to Mr. Hart's testimony. For present purposes. Sure. And so neither of those are maintenance problems as such. In and of itself, it's not a maintenance problem. There's a maintenance problem. It has to do with what changed because of the repairs. Correct. But I also want to clarify that the open hole to the ocean is problematic precisely because the pipe was not connected. I wasn't referring to the hole at the end of the exhaust. I was referring to the hole that was near the engine. And both of those present a problem. Well, you can't internally do it. If you plug up one hole, then the other one doesn't matter. Yeah, if you plug up the hole at the engine, then the fact that the exhaust is designed to be open doesn't create a problem. Or if you plug up the exhaust, it doesn't matter that you've got a hole. So the question here is whether, given the two experts' testimony, as Judge Tolman was explaining, is there a conflict of the evidence such as summary judgment wasn't proper? And that seems to resolve two issues. One is did Mr. Hart's expert totally debunk the theory of the insurance company's expert such that we're now at equilibrium? And if we're at equilibrium, who wins? Does Mr. Hart's expert have to have a theory of causation? The answer is he clearly did not debunk Progressive's expert's opinion. Mr. Hart's expert, Mr. Wolfe, simply said, I think he's wrong because. And the only reasons he gave were reasons that were not supported by evidence or specific facts in the record. He says the movement is not so if it was minimal. But that's not clear where that comes from when we know already that there's a three-inch and a four-inch attachment that's not been complete and that all the support brackets are not in place. And the only other thing that he says is that the configuration of the system and the tight-fitting components are the reason why Mr. Tupel, Progressive's expert, cannot be correct. However, Mr. Hart testified in his deposition, stated in his deposition, that the entire system was not securely attached. So those are the only bases on which Mr. Wolfe stated that Progressive's expert was incorrect. So you're essentially saying that Mr. Hart's expert's opinion should be disregarded because he didn't have evidence. It wasn't based on the actual facts. It's insufficient to create a genuine issue of material facts because it's not. Is that true with regard to the Waterhammer theory? Well, the first thing I want to point out about the Waterhammer theory is that that statement from Mr. Wolfe comes from an affidavit that is best for my – I've reviewed the record numerous times. That affidavit was not included directly in support of any of the briefing on the motion for summary judgment. So that's one concern. He does say the exhaust boot could not have become dislocated as a result – this is in the end of the report – as a result of water splashing or surging in the exhaust piping. So that essentially is the Waterhammer theory now. You can use the words, but it's the same theory. I think – I took Judge Pullman to be referring to a statement in the affidavit that Mr. Sieple had misunderstood or was technically incorrect about the Waterhammer. With respect to that statement in the affidavit, he's just attacking the term that he chose to use, not the methodology. With respect to Judge Bergeon's question, that goes to exactly what I stated earlier, that his only reasoning for saying that it could not have been caused, he doesn't provide any justification or specific facts or evidence that explain why it could not have been caused. That's precisely simply disavowing him. I'm a little confused by your answer. I thought he said in his report that he had conducted his laboratory test, and that had disproved the Waterhammer theory. And that was not before the district court on summary, Judge? The testing that he did was done precisely – and I stated in the report – that he did the testing to determine whether or not Mr. Hart's theory that the water freezing was the cause of the vessel sinking. And he concluded that it was not. Oh, not the water freezing. The report was filed in conjunction and in support of Mr. Hart's. I don't want to mislead the Court. The report was filed. It's the affidavit that it's a lot of references made to that was not included in the brief. So essentially, your argument is that on the front page of his report, Mr. Hart's expert report, he says relevant facts. One is that the vessel sank. That's not in dispute. Another is the nature of the storm, and for present purposes, I gather that is not in dispute. Then he says, Captain Hart had recently replaced the starboard main engine and reassembled the exhaust system, except for the connection to the engine, which was secured with wire or string, allowing about one-six-two engine motion. And what you're essentially saying is he had no basis for that. It's unclear to me where this one-sixty. The only source I can find for the one-sixteenth-inch statement is from a self-serving affidavit from Mr. Hart. In Mr. Hart's. A self-serving affidavit is an affidavit given in his name. It's still evidence. Any affidavit is self-serving. Although I will state that earlier in the deposition testimony, Mr. Hart had actually simply testified that it was unsecure, and it was a three-inch and a four-inch coupling. The one-sixteenth-inch statement came much later. So there is a basis in the evidence. He was the person who did this work, and he says it was one-sixteenth-inch. After he said in deposition that it wasn't secure. He said nothing about the one-sixteenth-inch until the motions for summary judgment were filed. But that, I mean, he's a percipient witness to that fact, right? He can say that. He can say that. But I think that's not, that doesn't, the fact that it says one-sixteenth-inch or not one-sixteenth-inch, I don't think actually determines whether or not Mr. Wolfe's report is sufficient. So if he, if he, so he doesn't have evidence to support for that. So what does he have evidence to support? He, well, he simply states that, without much explanation, that Progressive's expert is incorrect. But he doesn't explain why he's incorrect and why Progressive's theory doesn't hold true. I mean, Mr. Wolfe, the other expert wasn't so specific either. I mean, these are not the world's most elucidating reports. I think Mr. Siepel's report makes much more clear exactly which facts he's relying on. And the other problem with Mr. Wolfe's report is that he simply doesn't come out and say what did cause it. He simply says, he's wrong because, and I don't know what caused it. And I guess the question is, what was the state of the pipe at the time the boat sank, the exhaust pipe? The boot was off. Mr. Siepel finds that the boot came off because of the water sloshing into the engine through the open exhaust pipe. Let's have a look at the cause.  The three-inch and four-inch connection of the engine was not attached. It was tied on. And there was no supporting bracket at the boot to prevent the vibration that Mr. Hart's counsel referenced. That, Mr. Hart admits in his deposition, was the state of the engine. Is there a dispute on that? No. So, if I understand correctly, what that means is that water coming in, if the pipe was in that state, water coming in the exhaust hole would have worn up inside the boat. Is that the difference? I suppose if it went far enough up, it could have come to that opening. But the expert, Mr. Siepel's opinion is that the water came in through where the boot had been located, which was dislodged. Well, that's what I was asking you. The boot was dislodged. During the course of the storm, pushing the water inside the exhaust pipe, dislodged the boot where the water came. Okay, but there's no dispute about whether the boot was dislodged? We know that when the boat was raised, Mr. Hart found the boot in the bottom of the boat. That much we know. And his expert says, the exhaust boot could not have become dislocated as a result of water sloshing or surging in the exhaust piping. Although the exhaust system installation had not been completed, the allowable motion in the system is insignificant and would not have played a role in causing the system to come apart. And then the geometry of the system, combined with the type of engine the propeller is based on, is extremely unlikely and so on. So your objections to that, as I understand it, are two. One is that you think there's insufficient evidence of the allowable motion in the system, although Mr. Hart does testify to it. And the second is that it's not specific enough. He specifically says that the water sloshing around couldn't have been the reason it dislodged, and your expert says it is the reason it dislodged. Why isn't that a basis for not having some objection? The problem with Mr. Wolfe's expert's report, Mr. Wolfe's report, is that he simply states it without offering any facts and evidence. He simply says the movement or the tight-fitting component. And your expert says the weight of the water in the pipe, along with the weight of the ice, allows seawater to slide easily and so on. I mean, why is that any more specific or any more detailed? Well, the problem with Mr. Wolfe's report is not that it's twofold. It's, one, that he's drawing not upon the complete evidence. His testimony about the tight-fitting components and the movement is, as best we can tell, based solely on the affidavit of Mr. Hart and his experiment in his laboratory. Mr. Hart has additional resources that he's drawing upon, as stated, including the fact that he inspected the boat, he spoke with Mr. Hart in detail, but he saw the boat immediately after it came out. So he could see the state of those fittings. The essential problem is that Mr. Wolfe's theory is that there is no theory, that the boat just sank. But we know, even from Mr. Hart's deposition testimony, that he admits that the boot came off and the water came in the boat. So, clearly, something caused the boot to fall off. But under Mr. Wolfe's theory, well, the water sloshing couldn't have done it, but we know it did. Mr. Hart is the one who put the boot on there. Correct. Okay. So there could have been various causes for the boot to come off. You can sort of speculate what they might have been. It might have been something to do with a water hammer. It might have been something to do with the fact that it was improperly secured at both ends. So if you don't have it anchored at both ends, it's more likely to come off when the wind is blowing. It could have had something to do with not having a big enough clamp or whatever holding it down, connecting it to the pipe. It may just have been the storm. It could have just have been that the storm was blowing so hard, the boot happened to be in a place where the wind came really hard and it just got torn off, and we would have gotten it torn off even if Mr. Hart hadn't worked on it. But I don't think that last idea works, given the state of the evidence. It's interesting that the insurance company's expert does give a lot of weight to the lack of a muffler guard, and that had nothing to do with the maintenance. Well, I think what Mr. Spiegel's point was, as I read his report, is not that not having a muffler guard on the system, if it was installed properly, is a problem, but that this simply could have been prevented by somehow stopping the water from entering that exhaust opening in the stern of the boat. So if Hart leaves the vessel in a partially reinstalled state, that he has an additional duty to avoid a charge of negligent maintenance to cover the exhaust opening on the stern, at least on the starboard side. And I think that's true. He's basically saying that if Mr. Hart – one of the concerns that Mr. Hart expressed was that the insurance company was telling him he couldn't leave his boat in the harbor. I think Mr. Spiegel's responding to that by saying one of the options that you had was to prevent the water from entering the exhaust pipe, and that was very simple to do. Put a rag in it, cover it up somehow, or have a muffler guard. And so with the open hole to the ocean, there was no other explanation, and I think that Progressive has provided the evidence. Hart has failed to rebut that evidence. Thank you. One moment. I just want to discuss briefly the evidence regarding Mr. Wolf's affidavit. Mr. Wolf did submit an affidavit, I believe, in support of the motion for summary judgment, or opposition to the motion for summary judgment. It's a four-page affidavit, number five in the plaintiff's excerpts. Mr. Wolf is quite specific. He says that the reference to the water hammer is incorrect. The water hammer is not applicable. Mr. Spiegel's theory that water suction in the pipe caused the clamper boot to come off is not supported by our technical analysis. He describes the facts as I have. But your client worked on the boot, and the boot did come off. I mean, you can't get away from that fact. He didn't secure it. I mean, the boot is supposed to be secured at two ends. It's supposed to be secured to the vertical pipe, which is a horizontal pipe at one end, and to the vertical pipe going to the engine at the other end. It was secured at both. The boot was clamped on the horizontal pipe as well as the vertical pipe. The vertical pipe, where it runs into the engine, was not secured to the engine. It was tied off with a wire, with what was only a 1-16 plate. Mr. Wolf recreated the system in his laboratory, and that's why he gave his analysis that the system was rigid and could not have happened as Mr. Seppel described it. If you read his affidavit, he describes the facts as he understands them, in confort with the facts as set out by Mr. Hart. Thank you. All right. Thank you. The case is now in a standstill. We'll next hear an argument on Pankratz v. Pankratz v.
judges: Kozinski, Berzon, Tallman